[No. 22090. *En Banc.* January 9, 1931.]

*In the Matter of the Estate of* JAMES FAUCETT, *Deceased.*

EMMA MORRISSEY *et al., Appellants,* v. BUICHIRO ITABASHI *et al., Respondents.*[1]

*Allen, Froude, Hilen & Askren* and *Knickerbocker & Hunt,* for appellants Morrissey *et al.*

*David J. Williams,* for appellants Stewart *et al.*

*Bogle, Bogle & Gates* and *Edward G. Dobrin,* and *John F. Reed,* for respondents Itabashi *et al.*

[1]Reported in 295 Pac. 118.

MILLARD, J.—This is a will contest. The trial below resulted in findings and conclusions sustaining the will. From judgment dismissing their petition, the contestants have appealed.

The decedent, James E. Faucett, was born on a farm near Auburn, Washington, where he lived unmarried until his death in September, 1927. He acquired title to the farm in early manhood by deed from his parents. Though mentally dull and of little education, Faucett left an estate inventoried at approximately one hundred thousand dollars. The size of his estate was largely due to the increase in land values. He tenaciously clung to his acres as a miser hoards his gold. On August 16, 1927, when about seventy years old, the decedent made his will. He died September 7, 1927, twenty-two days later.

By his will, Faucett devised a valuable ten-acre tract to two Japanese children, born on the farm, the nephew and niece of the Japanese tenant who had occupied and cultivated the place for some twenty years prior to Faucett's death. The will gives a life estate to another portion of the farm to the Japanese tenant, at an annual rental the same as the tenant was paying at the time the will was executed. A sister and a niece of the decedent, except for nominal bequests, were disinherited. The remainder of the estate goes to the surviving sisters and children of a deceased sister.

Appellants contend that the decedent was not mentally competent to make a will. We are convinced by our examination of the record that Faucett was physically incapable of expressing his desires, and that he was mentally incompetent to make a will August 16, 1927. In 1923 Faucett began ailing. In March, 1924, the disease that caused his death was diagnosed as carcinoma of the tongue and jaw. Portions of the

tongue and jaw sloughed off and he lost his teeth, with parts of the jawbone. Appellants' witnesses, most of whom were for many years friends and neighbors of the Faucett family, testified that it was impossible during the summer of 1927 to understand anything the decedent tried to say. Faucett's banker testified that he would have not been able to understand Faucett the last time he saw him, three months prior to Faucett's death, if he, the banker, had not had knowledge previously of the transaction Faucett endeavored to explain. There is no dispute that, during the summer of 1927, it was difficult for Faucett to talk understandingly. There is no evidence, other than the making of his will, that, during 1927, Faucett was competent to transact any business.

It is inconceivable, in view of the cancerous condition of his tongue and jaw, that Faucett was capable of intelligently expressing himself orally at the time the will was made. It clearly appears from the evidence that he was not able to otherwise communicate his desires. He could not make signs. He was too weak to write; in fact, he was unable to raise his hand and keep it uplifted any length of time. The principal witness (the lawyer who drafted the will) for respondents, testified:

"He was still too weak, I thought, to write his name, and in fact, I had to hold his hand up. He could hardly hold it up. He could raise it up and drop it down, but I held his hand up and made a cross and I signed his name."

To sustain the judgment is to disregard the overwhelming weight of testimony supporting the position of appellants. The witnesses for the appellants testified, substantially, as follows:

Dr. Hoffman. From 1912 to the date of Faucett's death Dr. Hoffman was Faucett's family physician

and friend. From March, 1924, to June 6, 1927 (the last time Dr. Hoffman saw his patient and three months prior to the death of the patient), Dr. Hoffman saw Faucett twenty-four times at the physician's office and sixty times at Faucett's home. During the early period of his illness, the patient was clear mentally, but about six months preceding his death

". . . his mental condition was such that I could not be of any benefit to him. I could not talk to him in an understanding way so that he could understand me or I could understand him."

Old age childishness or senility was very pronounced.

Dr. Brandt, a physician residing at Auburn, Washington, treated Faucett occasionally over a period of years. The last two occasions that he saw Faucett were April 13th and 14th, 1927, four months prior to the making of the will. The physician testified that, on April 13th and 14th, Faucett was passing through the "pre-senile stage, if not already in the senile stage of life," and that Faucett's "judgment would not be within a considerable degree of that of a normal individual."

"Q. Was he able to articulate with sufficient clearness so that you could understand him? A. Just occasionally a word, perhaps enough to catch a little drift, but I could not really understand what he had to say at that time. Q. Was he able to enunciate with sufficient clearness so that you could determine from his conversation alone what he was trying to tell you? A. I would not have had any clear, definite understanding whatsoever."

Dr. Wilt, a neuro-psychiatrist, was for nine years assistant superintendent at the Western State Hospital, Fort Steilacoom, Washington. In response to a hypothetical question based substantially upon a state of facts in harmony with the testimony of appellants' witnesses, Dr. Wilt concluded that, upon

such facts, the decedent was suffering from senile dementia; that mental cases of the type of Faucett's are susceptible to influence; that a man in that condition would be incapable of understanding ordinary business transactions; and that carcinoma patients do not have a bright mind up to the time of death.

"They are stupid and drowsy for months before the end comes. I have just attended one of your local people here suffering from the same disease, and he was in a stupor for months."

The testimony of Dr. Nicholson, a specialist in nervous and mental diseases, coincided with that of Dr. Wilt.

The testimony of Mr. John F. Reed, an attorney of Seattle, is sufficient for the reversal of the judgment, if Mr. Reed is worthy of belief. Mr. Reed has been an active member of the bar of this state for more than thirty years, a man of excellent reputation, and one whose integrity has never been questioned. From 1925 to date of Faucett's death, Mr. Reed was Mr. Faucett's attorney, on a regular monthly retainer. Mr. Reed received additional compensation for unusual services. He had personal charge of Faucett's business, invested Faucett's money, and had in his hands, when Faucett died, sixteen thousand dollars belonging to the estate. Mr. Reed testified that, from April, 1927, it was difficult to understand Mr. Faucett because of the cancerous condition of the latter's tongue; that in July and August it was impossible to understand Faucett.

"I do not remember what date it was, but it was in the spring or summer of 1927, I spent considerable time with him and I could not get at the subject. I called Mrs. Hodge in and we both tried—and he tried —he made a great effort to make himself understood, but neither one of us could get at the subject he was talking about."

This witness visited Faucett weekly during the summer of 1927. He saw Faucett on August 10th, six days before the will was made, and again on August 19th, two days subsequent to the drafting of the will. Faucett could not make himself understood on either of these occasions.

"A. He was never able to talk with me during August. I do not think that he talked with me so that I could understand anything during July. Q. You do not think that they could understand him? A. Well, this is what I mean to say on that. If you knew or had any reason to know what he was speaking about, where he would only make once in a while a word known, you could sometimes guess what he was trying to say, but if he was talking on something that you had not any idea what it was, I do not believe that there is any human being that could tell what Mr. Faucett was saying during July and August."

Mr. Reed further testified that, as the disease progressed, Faucett's mentality correspondingly declined.

"A. Well, I think mentally he was declining a good deal, as he was physically; that is, I think he became more and more confused as his disease continued. That is the way it seemed to me. He seemed dull and drowsy and it seemed that way to me, as if he was— it was just becoming impossible for him to collect his ideas so that he could understand. Q. During the months of July and August, 1927, in your opinion, did he have—did he ever adequately comprehend any matters that you tried to explain to him? A. I do not think that he did. Q. I will ask whether in your opinion there was any time during those two months that Mr. Faucett was mentally able to transact business, even of any ordinary character? A. I do not think that he could. Q. You have had occasion to read and study the will in evidence here as Contestants' Exhibit I, I take it, Mr. Reed? A. I have. Q. In your judgment, Mr. Reed, was there any time during the month of August, 1927, that Mr. Faucett would have

been mentally able to explain or give instructions relative to the preparation of a document of that kind? A. I do not think there was. Q. Also in your judgment, Mr. Reed, was there any time during that month when you think that Mr. Faucett could have been— would have been able to adequately understand or comprehend the terms or the effect of an instrument of that kind? A. I do not think there was a time.''

Surely that witness was qualified to pass on Faucett's capacity to make a will. His intimate relationship with Faucett, who trusted him as he trusted none other, the frequent consultations Faucett had with this attorney, the legal training of this witness, and his character as a lawyer and man, entitle his testimony to great weight.

The decedent's sister, Mrs. Hodge, kept house for her brother several years before he died. She testified that, during the last year of his life, Faucett's memory began to fail and that, following the hemorrhage he suffered in April, 1927, she noticed a marked change in his mental condition; that she could not ''understand anything that he said sufficiently to obtain any connected sense or to conduct a connected conversation with him.'' Faucett informed Mrs. Hodge that she ''ought to be good to Johnny [a Japanese tenant who was made a beneficiary under the will and busied himself greatly in the matter of securing a lawyer other than Mr. Reed to draft the will]; that he was keeping us.'' At the time Faucett made this statement, he had large sums of money in the bank and he was, of course, suffering from a delusion.

Mr. Behne, who has been president of the First National Bank of Auburn (of which bank Mr. Faucett was a patron) since its organization in 1908, was often consulted by Faucett concerning business matters. He testified that the last time he saw Faucett was in May, 1927, three months prior to Faucett's death. While

of the opinion that at that time there was some business that Faucett could transact, he testified that not only was Faucett's memory failing, but "he seemed to have lost interest in the affairs which usually occupied his mind." He said that it was impossible to understand Faucett's speech.

"Q. I will ask you whether in your judgment, without reference to the note, and without knowledge—without previous knowledge of the transaction, you think you would have been able to understand what Mr. Faucett tried to tell you? A. Not in the last month or two. Q. Had you been called on to discuss some strange subject . . . do you think you would have been able to understand his speech sufficiently to have learned what he was saying? A. No, sir, I would not."

When questioned on cross-examination whether Faucett could have understood the will, Mr. Behne testified:

"Q. You think that with any advice he could have comprehended it? A. I do not believe that he could. Q. Now, why do you doubt it? A. Well, in a way, he did not seem to comprehend anything that was discussed."

Mr. R. H. Thompson, employed by Mr. Reed to make a survey, called on Mr. Faucett four times, the last time in April, 1927. He testified that it was almost impossible at that time to understand what Faucett said, and it was his conviction "after my second trip that the man was *non-compos mentis.*"

Mr. Lockridge, a resident of Auburn for thirty-four years, a former school-teacher and at present the president of the Washington Berry Growers' Packing Corporation, was well acquainted with Faucett; in later years living only a short distance from the Faucett home. When, about two months prior to his death, Faucett tried to talk to Mr. Lockridge about

park boundaries, it was impossible to understand him. In reply to the question whether Faucett's mental condition at that time was such that he could have outlined the terms of the will, Mr. Lockridge answered:

"I do not think he could. I do not think it was possible that he could dictate or suggest a document of that character."

Mr. Aaron S. Neely, a resident of the same locality as Mr. Faucett since 1874, Mr. Rodia, a lessee of Mr. Faucett, and Mr. Downing, who is engaged in the real estate and insurance business and has resided in Auburn for more than twenty years, testified that, in July and August, 1927, it was impossible to understand anything that Faucett attempted to say. Other witnesses testified to the same effect, and also testified that Faucett's rapid mental decline was noticeable.

Respondents' witnesses testified as follows:

Dr. Frank D. Merritt visited Mr. Faucett twice, September 2d and 6th, 1927. On his first visit, he could not feel Faucett's pulse, but could hear his heart with a stethoscope. He gave Faucett a hypodermic injection of strychnine which revived him. The physician testified that Faucett's mind was clear,

". . . but he was like a run down battery that you put your starter on and there is not enough to keep it up. His mind was clear but I would like to qualify that by saying that the mind is influenced by the state of the body in that he was not in a condition to undergo any exertion. That is, if he had been asked to exert himself mentally he might, on account of his weakened physical condition, possibly have fainted or even expired."

Asked whether Faucett could have dictated the will, Dr. Merritt replied:

"He would have been able to start off probably, but before it was finished I am afraid that he would have weakened. Q. In other words, if you took a suffi-

ciently long time, even at the period you saw him, you could explain the terms of that will to him so that he could have understood it, but it would have taken a longer period of time to enable him to rest up? A. He would have needed added stimulation and I should have, as a physician, been afraid that he would likely die before he got through."

Johnny Itabashi, one of the Japanese beneficiaries under the will and lessee of Faucett, testified that one day Faucett said he wanted a lawyer.

"And I asked Mr. Faucett 'you want this lawyer, Mr. Reed,' and he said 'No.' I say, 'Why?' and he say, 'Oh, Reed, he is pretty crooked. I don't want him, I want other one,' and he said 'I guess Mr. (naming another lawyer) is pretty good.' . . ."

Itabashi testified that he then went to the home of the attorney named and brought him to Mr. Faucett.

When this conversation is testified to have taken place, Mr. Reed had been Mr. Faucett's personal attorney for some years and was still under retainer by him. The only inference to be drawn from this testimony is that the witness falsified in an endeavor to justify his calling an attorney other than Mr. Reed; or, if such a conversation was had by Itabashi with the decedent, Faucett's mentality was gone. There is not the slightest evidence that Mr. Reed and Mr. Faucett had had any disagreement or that there was anything done to cause Faucett to suspect Mr. Reed of anything improper.

The attorney called to draft the will testified that he obtained some information from Faucett about what he wanted,

". . . but I did not get very much because of his inability to talk—he seemed to be gasping and very sick, and I really thought the man was dying, to be honest about it."

He further testified that the decedent's mouth was cleansed and then he, the attorney, began asking questions; that after about two hours, Faucett saying "No" to different suggestions made, he finally obtained the information upon which to draw the will. He was unable, however, to obtain the names of the relatives of Faucett. He testified that he got their Christian names but not their last names, and that he obtained their last names from Mrs. Hodge. He was also unable to understand from Faucett who Tomio and Frances (two of the Japanese beneficiaries under the will) were, so he asked Mrs. Hodge, who supplied that information. Johnny Itabashi was present during the time of the drafting of the will. He testified that he did not know that a will had been made, or that he was a beneficiary until some time thereafter. He denies that he was there on the following day when the will was executed, even though all of the witnesses testified to the contrary. A reading of his testimony convinces us that this witness is not worthy of belief, and the inference is irresistible that he inspired the provisions of the will.

The attorney who drafted the will submitted a claim against the estate for five hundred dollars which was finally compromised by his acceptance of one hundred and fifty dollars. At that time Mr. Reed, so he testified, stated to the attorney:

"I do not see how you could have possibly obtained from Mr. Faucett the information necessary to enable you to prepare his will."

The attorney replied that he could not have prepared the will if he had not known what disposition Mr. Faucett desired to make of his property from information received from him previously, when the attorney was acting as Mr. Faucett's legal representative. This is not consistent with the facts. The at-

torney who drafted the will had not acted as Mr. Faucett's attorney for many years prior to August 16, 1927. During that period, Mr. Faucett had repeatedly stated that he would never make a will. Mr. Reed was asked on cross-examination if it were not possible that he might be mistaken about this conversation. He testified:

"A. No, it is not so, because I have always thought that it would have been impossible for anyone to have obtained that information from Mr. Faucett, and that conversation took place at the time I notified Mr. (attorney who drafted the will) that we would allow him $150.00 for his services in drawing the will. As far as I am concerned I understood him clearly and I put the question to him clearly. It is not a matter in which I could be mistaken about the conversation. Q. Now, Mr. Reed, isn't it a fact that what occurred at that conversation was that you said that you could not understand him, but Mr. Blank said that by questioning him he could get all out of him that he needed? A. No, I do not remember that I ever had any such conversation such as you mention with Mr. Blank. It would not be a question of my understanding or Mr. Blank's understanding, I have been there when we all tried to understand him and no one could pick out what he meant."

Henry Sicade testified that he saw Faucett in 1927 when he went to collect water rent from Johnny, a Japanese tenant of Faucett. He performed no business with Faucett, and his conversation was merely a casual inquiry as to his health. He testified that he was with Faucett a minute or two, that Faucett had difficulty in talking and that his mouth was in pretty bad shape.

John Caples visited Faucett two or three weeks before the latter died. He did not stay any longer than he had to because of the disagreeable odor in the room.

He testified that Mr. Faucett spoke with difficulty, but that he could understand him.

J. P. Gorman, who knew Faucett about fifteen years, testified that he saw Faucett about June 1, 1927, when he stopped to inquire as to Mr. Faucett's condition. He concluded that Mr. Faucett was mentally competent, but he stated no facts upon which he could base such conclusion.

W. W. McDonald testified very briefly. He called on Mr. Faucett in August, 1927, spoke to him, was recognized and departed.

I. Okahara testified that he saw Faucett September 2, 1927, and that he said "Hello, Mr. Faucett," and that was the extent of their conversation.

Timothy Evans, who has lived in Auburn thirty-five years and was a neighbor of Faucett, testified that he saw Faucett in June, 1927, and collected from Faucett certain water rent; that he and Faucett talked about a few things and Faucett said when he paid the rent, "I guess I had better have a receipt for that." There is no testimony by this witness as to Faucett's condition, but he concluded that Faucett was "in very good shape mentally."

H. K. Fukuhara. The trial court gave no credence to the testimony of this witness. Neither do we.

Margaret Pitman, a niece of Mr. Faucett, testified she last saw Mr. Faucett about July, 1927, and that at times he could be understood and that at other times it was impossible to understand him. She was asked whether Mr. Faucett was of sound mind the last time she saw him, to which she replied, "Well, as far as I know, he had his right mind, as far as I know."

Mrs. Anna McNary, a niece of Mr. Faucett, last saw him July 15, 1927. She testified that at times she was able to understand him, and at other times she could not understand him.

W. P. Joslyn, a resident of Auburn for sixteen years and at the time of the trial sixty-one years old, testified that he last saw Faucett in March or April, 1927, and that Faucett's mental condition was perfectly sound right up to the last days he saw him.

William E. Burson and wife were neighbors of Faucett since 1920. In 1922, Burson borrowed fifteen hundred dollars from Faucett on a mortgage. The loan not being paid, the mortgage was foreclosed by Mr. Reed in 1924. Burson borrowed an additional four hundred and fifty dollars from Faucett on a note that was never paid. About a year prior to Faucett's death, and subsequent to the foreclosure of the mortgage, and when he was in default on his note, Burson had almost persuaded Mr. Faucett to advance twenty-five thousand dollars to go into the bail bond brokerage business with Burson. Due to Mr. Reed's influence, Mr. Faucett refused to lend the money. It is inferable that, because of this, Mr. Burson became unfriendly to Mr. Reed.

The last time Burson saw Faucett was the last week in August, 1927. He testified that Faucett told him, some time prior to that, that the Japanese children were to have his land. He also testified that, on several occasions, Faucett informed him that he would never make a will. The testimony of Burson concerning his last visit is to the effect that he conversed with Faucett and was of the opinion that Faucett had sufficient mentality to communicate to an attorney the matters in the will; that Faucett was entirely capable of doing that the last time the witness saw him. This witness was impeached by the testimony of Michael Enders that, about January 2, 1929, in talking with Burson concerning the Faucett case, Burson told Enders:

"I know that Jim didn't know nor didn't care what he was doing at the time he signed the will. I think Faucett didn't know when he was signing that will; in fact, I know that he didn't."

Mr. Burson's wife saw Mr. Faucett some time during the summer of 1927. Her testimony is corroborative of that of her husband.

Clearly, Mr. Faucett was not mentally and physically capable August 16, 1927, of making a will. The judgment of the attorney who drafted the will that the decedent was mentally competent and physically capable of making a will should not be considered of greater weight than the judgment of Mr. Reed that Mr. Faucett was physically and mentally incompetent. It should be borne in mind that the attorney who drafted the will did not have the same opportunity as Mr. Reed for observation of, and contact with, Mr. Faucett. Mr. Reed was attorney for Mr. Faucett for a number of years. He had observed the gradual change of mind and body and had transacted Faucett's business and visited with him once a week during the spring and summer before Mr. Faucett died.

The contact of the attorney who drafted the will with Faucett was limited to the evening before the will was drawn, when the Japanese arrived to take him to Faucett's bedside. True, there is testimony that, some years earlier, the attorney had transacted business for Mr. Faucett. There is no evidence that, at any time, the attorney obtained from Mr. Faucett the information for the drafting of the will. At the time the will was made, Faucett was unable to inform the attorney as to the disposition he desired to make of his property. The element to be considered in determining the credibility of a witness is the interest of that witness in the outcome of the suit. Naturally,

one who drafts a will is interested to the extent of desiring that the will be sustained. Neither the good faith of the attorney who drafted the will, or of Mr. Reed, need be impugned. The testimony of Mr. Reed and the testimony of Mr. Faucett's physicians, particularly his family physician, on whom Faucett called twenty-four times and who visited Faucett sixty times during Faucett's illness, greatly outweigh all testimony contrary to the contention of appellants. That testimony can not be disregarded. It conclusively establishes not only the physical incapacity of the decedent, but also the mental incompetency of the decedent to make a will.

The foregoing is sufficient without considering the delusions of Faucett. Under the delusion that she was not related to him, Faucett disinherited one of his nieces. He also suffered from the delusion that some persons were starving him and that one of his Japanese tenants was supporting him.

The judgment is reversed, and the cause remanded with directions to set the will aside.

MITCHELL, C. J., FULLERTON, BEALS, and MAIN, JJ., concur.

HOLCOMB, J., concurs in the result.

TOLMAN, J. (dissenting)—The facts in this case should be approached from the standpoint of the trial judge who saw and heard the witnesses and who, presumably, gathered the true situation, not alone from the words spoken, but from all of the surrounding circumstances and from the mental attitude disclosed and the demeanor of those testifying.

It is a well known fact that the most honest witness, when his sympathies are aroused and when aided by even a slight tincture of race prejudice, is prone to exaggerate. If allowance be made for these human

failings, it is at once apparent that the evidence does not preponderate against the findings of the trial court.

While the majority opinion quotes copiously from the testimony, it by no means gives all of the material evidence, and failing to allow for the tendency to exaggerate, already mentioned, it, in my opinion, presents a picture which is unfaithful to the true situation. If the testimony of appellants' principal witnesses is to be taken literally and to be believed implicitly, as the majority seems to hold, then of course it was a physical impossibility for the decedent to have made known to anyone his wishes and desires as expressed in the will. But, upon the other hand, respondents' witnesses, while admitting a considerable difficulty in articulation, were just as positive in their positions that, by the exercise of care, attention, patience and the use of considerable time and skill, the decedent's wishes and desires could be and were clearly ascertained. There is much in the surrounding circumstances which tends to confirm the respondents' witnesses; and, taking the whole record and considering it carefully, I, for one, am wholly satisfied that, prejudice aside, it cannot be said that the evidence preponderates against the findings of the trial court.

At first thought it might be said that the terms of the will giving, or attempting to give, substantial benefits to Japanese children of American birth, and to the Japanese tenant of the farm, is such an unnatural disposition of the decedent's property as to raise a presumption against the will; but when the history and characteristics of the testator are studied, that thought loses its force. The decedent was born on this farm. For the greater part of his life he owned, controlled and zealously conserved and man-

aged it. He devoted his life to the farm and it supported and provided for him. Without wife or children and with no close personal relations with anyone after the death of his parents, the farm became his one overshadowing interest in life. To take an acre from it was like taking a member from his body, and although he had frequently declared he would never make a will, yet, presumably, he in the end saw that the best and, perhaps, only opportunity for keeping the farm intact after his death was to give a home tract to the American born Japanese children, with a life lease on the remainder to the Japanese tenant. He was thus assuring that his beloved farm would continue in the same care under which it had prospered for twenty years, and delaying, by the life term of the Japanese tenant, the time for its being dismembered and cut up and sold as city or suburban building sites. This thought, coupled with an ancient grudge against those relatives disinherited, makes the will understandable and logical and its disposition natural, from the standpoint of the testator.

I am convinced that the evidence in no respect preponderates against the findings of the trial court, and that the judgment should be affirmed.

I therefore dissent.

PARKER, J., concurs in the result reached by TOLMAN, J.