[No. 24473. Department One. August 22, 1933.]

FIDELITY & DEPOSIT COMPANY OF MARYLAND, *Appellant,*
v. OPPORTUNITY STATE BANK *et al., Respondents
and Cross-appellants.*[1]

[1]Reported in 24 P. (2d) 399.

*Jas. A. Williams,* for appellant.

*Randall & Danskin,* for respondents and cross-appellants.

HOLCOMB, J.—Appellant executed a surety bond in the sum of five thousand dollars in favor of the Opportunity State Bank to insure it against loss through "the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication, or misappropriation, or any other dishonest or criminal act or omission" on the part of Charles A. Schureman, Jr., cashier of the bank. A claim was made by respondents against this bond on account of an alleged "wrongful abstraction," on which appellant made payment in the sum of three thousand dollars.

After having made such payment, appellant began this action in which it is alleged that it was induced to make the payment above mentioned through certain misrepresentations and withholding of material information by respondents, and sues to recover the amount paid, with interest.

Schureman had for a number of years been cashier of the Opportunity State Bank until about December 23, 1930, when he purchased the stock of one N. A. Rolfe, who had been vice-president, and succeeded Rolfe to that office. The vice-president, under both Rolfe and Schureman, was the one actively in charge of the bank. Commencing with the year 1926, Schureman had at various times borrowed money from the bank, the loans in excess of three thousand dollars being unauthorized.

The bank became insolvent, and passed into the hands of the supervisor of banking for liquidation on January 24, 1931. On April 18, 1931, the supervisor, through his special deputy supervisor of banking in charge of the liquidation of the failed bank, made the

claim to appellant for the payment of three thousand dollars on its bond obligation, in which claim it was stated that

". . . because of the fraud, dishonesty, theft, embezzlement, wrongful abstraction, misapplication and misappropriation and the dishonest and criminal acts and omissions of Charles A. Schureman, Jr.,"

and that Schureman had never been authorized or permitted by resolution of the board of directors or in any other method or manner, to borrow money from the failed bank in any sum whatsoever; and that, on January 24, 1931, Schureman had a credit on the books of the failed bank in the sum of four thousand dollars, which amount had been applied by the supervisor of banking against the amounts wrongfully abstracted and stolen by Schureman from the failed bank, leaving a balance of three thousand dollars, for which claim was made. On June 2, 1931, these officers presented to appellant their formal proof of loss, in which reference was made to the claim that had been made, and it was stated that there were no counterclaims, offsets, or credits of any nature whatsoever other than those stated therein.

Appellant asserts that the proof of loss so made was on the theory of "wrongful abstraction" by Schureman of the seven thousand dollars and did not disclose any counterclaims, offsets or credits, except the four thousand dollars on deposit which had been credited.

The theory of appellant was and is that three thousand dollars of the seven thousand dollar claim was represented by authorized loans, and was not protected by the bond; and further, that Schureman, after the bank had closed its doors, had turned over to the liquidator the four thousand dollar credit and his home place to be sold, the proceeds of both sources to be applied, first, on any balance that might be due on ac-

count of "wrongful abstraction," and the remainder on any unpaid balance of this seven thousand dollars evidenced by a six thousand dollar note and two five hundred dollar notes. His home place had been deeded to the failed bank after the liquidator took charge, from which respondents realized a net sum of $1,205.30. Appellant contends that both of these sums should have been credited upon any "wrongful abstraction," and that these facts were withheld from appellant.

The trial court made findings to the effect that all of the seven thousand dollars constituted "wrongful abstractions" by Schureman, and that, after crediting the four thousand dollars on deposit, there remained three thousand dollars which was a proper claim against the bond. The court, however, further found that there were misrepresentations by respondents in that the home place of Schureman was turned over to the liquidator, the proceeds to be used toward the settlement of the "wrongful abstraction," and that, at the time the settlement was made by appellant on June 11, 1931, it was only liable in the sum of three thousand dollars, less the net amount received by respondents from the sale of Schureman's home place in the amount of $1,205.30. Judgment was accordingly entered in favor of appellant for the net amount so realized for the home place.

Appellant claims that the "wrongful abstraction" by Schureman did not exceed four thousand dollars, and that this was fully settled by the application of the credit which Schureman had on the books of the bank; and, through the application of the four thousand dollar credit and the net amount realized from Schureman's home place, all claim against the bond of Schureman was discharged.

The evidence also shows, and Schureman's confessions confirm it, that the six thousand dollar note was

the balance of Schureman's "kiting" operations with the Saybrook bank in Illinois, operated by his father. No record was kept of the loans made by Schureman except an original one of money borrowed when he bought his home in February, 1926, in the sum of $2,985. Thereafter, when these "kiting" operations were being practiced, in order to deceive the bank examiner, his loans were carefully concealed from the bank and its directors.

In their claim of loss, respondents represented that Schureman wrongfully abstracted six thousand dollars by drawing a draft on the Saybrook bank, October 20, 1930, and executed his note to the Opportunity State Bank, which note was included in the loans and discounts of the bank, but not entered on its note register, all without the knowledge or permission of the directors. This note was renewed on January 23, 1931, and found in the bank. Schureman also wrongfully abstracted one thousand dollars by passing a credit of five hundred dollars to N. A. Rolfe in December, 1930, and another credit of the same amount to Rolfe in January, 1931, for which Schureman executed his note in the sum of one thousand dollars, which was not entered on the note register.

When the bank closed, Schureman was the owner of 112 shares of stock, on which an assessment for superadded liability was levied, and the proceeds from the sale of Schureman's house of $1,205.30 were credited as received by the liquidator of the failed bank on the superadded liability on Schureman's stock.

After the appeal had been taken by appellant, respondents also cross-appealed from the findings of the trial court that the moneys borrowed by Schureman were evidenced by promissory notes given by him to the bank; that Schureman deeded to the liquidator of the bank his home place with the agreement, under-

standing and direction, that the property should be sold and the net proceeds applied toward the liquidation of any moneys due from Schureman to the bank, due to any criminal acts; that, in the claim and proof of loss made by respondents, they failed to disclose that there was a further credit of $1,205.30 which should have been applied toward the reduction of such loss received through the sale of the real estate; in making its conclusion of law to the effect that appellant was entitled to judgment against respondents in the sum of $1,205.30, with interest from June 11, 1931, at six per cent per annum and its costs and disbursements, and entering judgment therefor in favor of appellant; in failing to enter judgment in favor of respondents.

Although both parties have appealed, for brevity they will be designated as appellant and respondents.

Schureman had kept a secret record of his loans with the bank with numbers ranging from 14131 to 15452, none of which numbers had been reached by the bank's regular loans even in March, 1930, a year later. He admitted that no one but himself could tell anything about his own purported loans from the bank. Prior to the trial of this case, Schureman had pleaded guilty to falsifying the books of the bank and to converting the bonds of certain customers, and had been sentenced to the reformatory. He had previously made detailed confessions to Moulton, the liquidator in charge of the failed bank, and to Randall, one of the attorneys for the liquidator.

The resolution, admitted over the objection of respondents, upon which appellant relies as authority to make loans to the extent of three thousand dollars, which was adopted at a regular meeting of the board of directors of the failed bank at its banking house on the evening of March 26, 1930, at 7:30, at which direc-

tors Sommer, Gillespie, Talbot, Myers and Schureman were present, reads:

"The application for a line of credit to Geo. W. McCallum was considered. It was decided to wait until June or July to determine what the bank's loan policy would be with reference to apple crop financing.

"It was moved, seconded, and carried that the loan limit of the directors of the bank be set at $3,000 each, with the exception of Mr. Gillespie and Mr. Myers, whose present loans exceeding that amount were approved.

"All loans from No. 13563 to No. 13781 were reviewed before the board. It was moved, seconded, and carried that they stand approved."

The statute, Rem. Rev. Stat., § 3259, which then and now regulates such transactions, reads:

"No bank or trust company shall, nor shall any officer or employee thereof on behalf of such corporation, directly or indirectly, loan any sum of money to any director, officer or employee of such corporation, unless a resolution authorizing the same and approved by a majority of the directors, at a meeting at which no director, officer or employee to whom the loan is to be made shall be present, shall be entered in the corporate minutes.

"Every director and officer of any bank or trust company who shall borrow or shall knowingly permit any of its directors, officers or employees to borrow, any of its funds in an excessive amount or in violation of the provisions of this section, shall be personally liable for any loss or damage which the corporation, its shareholders or any person may sustain in consequence thereof, and shall also be guilty of a felony."

The resolution above quoted, even if otherwise sufficient as a formal approval of known and existing loans, did not approve unknown and secret loans, but at all events was invalid under the section of the statute quoted. The borrowing of money by a director and officer of a bank, contrary to the provisions of that

statute, would be unlawful and regardless of intent. *State v. Larson,* 119 Wash. 123, 204 Pac. 1041, and *State v. Lindberg,* 125 Wash. 51, 215 Pac. 41 (neither case cited by respondents).

Appellant seems to disregard that statute and those decisions in its contention that a vote of the corporation is to be presumed, though there was no proof of such a vote on record.

In the *Larson* case, *supra,* which was a prosecution for a felony under the same statute for loaning bank funds to an officer of a bank without procuring authority by resolution of the directors, we held that a subsequent approval of such unlawful borrowing by a bank officer would be no defense; and that the offense of loaning the funds of a bank to an officer without procuring the necessary authority involved no element of intent or motive. To the same effect is the *Lindberg* case, *supra,* in which we also observed:

"The statute is not without its purpose. Probably the most potent single cause of bank failures is the over-borrowing of bank funds by bank officers. It was this evil the statute was intended to remedy. It was intended to protect that part of the general public who make banks the depositaries of their funds. . . . If an officer of a bank who overborrows from his bank is permitted to plead in defense want of knowledge of his act, the statute will become a nullity."

Hence, the texts and cases cited from this and other courts by appellant to the effect that the presumption is always against illegality and in favor of legality, do not apply in such an instance as this.

The resolution heretofore quoted shows that Schureman was present when it was adopted, and it does not show direct ratification of any known loans of Schureman's to the extent of three thousand dollars. The statute above quoted forbids loans to such an officer as Schureman was, either directly or indirectly, at any

meeting when he was present. It is not to be presumed that the other directors present would have rendered themselves amenable to a prosecution for a felony under that statute and our decisions, had they known of any such loans. The statement of appellant, thereforce, that the resolution was a direct ratification of the previous loans made, among which were loans to Schureman amounting at that time to three thousand dollars or more, is erroneous and cannot be sustained.

The theory of the trial judge for granting judgment in favor of appellant in the sum of $1,205.30, as expressed by him, was that Schureman had done everything he could, as admitted by the liquidator, to make reparation; that reparation is the restoration for something wrong; the repairment of something wrongfully done. It is not the payment of an honest obligation, which is liquidation. The trial judge had also just said that the resolution which is termed an authority to borrow money did not appear to him to be such at all, with which we have hereinbefore agreed.

The controversy at the trial waged principally over the fact of whether the liquidator had insisted that the net proceeds of the home, when received, should be applied to the superadded liability of Schureman or not.

It was the duty of the liquidator, and he disclosed no other intention, to preserve and recover all funds that could be obtained for the relief of the creditors and depositors of the failed bank. Notwithstanding a reflection upon him by appellant, that "he was principally concerned in getting everything he could, but not particularly concerned with how he obtained it," we can see no instance in which he transcended his legal duty. There is some conflict between the testimony of Moulton and his assistant, who had been in the bank twenty days before the bank closed and was retained thereafter in a clerical capacity by Moulton, and

Schureman and his attorney as to whether or not it was agreed that the net profits of the home, when and as received, should be applied to the superadded liability or the other unauthorized borrowings.

As we read the findings made by the trial judge and analyze his reasons therefor, we are impressed that he did not give less credence to the testimony of the liquidator and his assistant, but that he derived a wrong inference from the facts as to the proper application of the house proceeds. There are many discrepancies in the testimony of Schureman, for which reason it should not be given as much credence as that of the bank officers. Moulton had been liquidating banks for several years, and had liquidated about forty banks.

There was no compromise and settlement in the transaction between him and appellant. To have made a compromise and settlement for less than three thousand dollars, it would have been necessary, under Rem. Rev. Stat., § 3269, to have obtained the approval of the superior court in that county. Undoubtedly, Moulton and his superior were fully aware of that requirement of the statute, since they had liquidated many state banks and knew that any compromise would have been contrary to that statute, without such approval.

Moulton and his assistant testified that Moulton notified Schureman, before the deed to his home place was procured, that it was to be applied on his superadded liability. One circumstance in favor of the probability of the truth of their testimony is that the first proceeds on the house deeded by Schureman were not received until July 27, 1931, long after the proof of loss had been made, which was as heretofore stated. Moulton, his superior, and his assistant, were exercising public official functions, and were not mere party or partisan witnesses. The cited cases, *Rust v. Washington Tool & Hardware Co.,* 101 Wash. 552, 172 Pac.

846, and *In re Faucett's Estate,* 160 Wash. 295, 295 Pac. 118, are not comparable to the situation in this case.

Whatever respondents designated the acts for which the claim was filed upon the bond is unimportant, since they set out the details with truthful precision. The acts of Schureman constituted much more than mere "unlawful abstractions," as designated therein. They, in fact, constituted "fraud, dishonesty, theft, embezzlement and misapplication," as well as "wrongful abstraction." To these things he had confessed to the liquidator and his attorney.

From what we have said, it is manifest that we cannot concur in the findings and conclusions of law from which respondents cross-appeal.

The judgment is therefore affirmed upon the principal appeal and reversed on the cross-appeal of respondents, with instructions to enter judgment in favor of respondents, and that appellant take nothing by its appeal. Respondents will also recover costs of the trial and of appeal.

BEALS, C. J., MILLARD, MITCHELL, and BLAKE, JJ., concur.